FILED

2025 Mar-20  AM 08:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER SCOTT MURDOCK** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | |
| | } | **CASE NO.: 4:24-cv-00015-MHH** |
| **LELAND DUDEK, ACTING COMMISSIONER OF SOCIAL SECURITY,** [1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Christopher Murdock has asked the Court to review a final adverse decision of the Commissioner of Social Security. The Commissioner denied Mr. Murdock's claims for a period of disability, disability insurance benefits, and supplemental security income based on an Administrative Law Judge's finding that Mr. Murdock was not disabled. Mr. Murdoch argues that, in denying his request for benefits, the Administrative Law Judge—the ALJ—improperly evaluated his (Mr. Murdock's)

---

[1] On February 17, 2025, Leland Dudek became the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Commissioner Dudek as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds office, the "court may order substitution at any time. . . .").

subjective complaints of pain under the Eleventh Circuit pain standard.  For the reasons discussed below, the Court affirms the Commissioner's decision.

## ADMINISTRATIVE PROCEEDINGS

To succeed in his administrative proceedings, Mr. Murdock had to prove that he was disabled.  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically determinable impairment that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least 12 months."  *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or his past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

--------

[2]  Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same."  *See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Nov. 19, 2024).

*Winschel v. Comm'r of Soc. Sec. Admin*, 631 F.3d 116, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

On November 9, 2020, Mr. Murdock applied for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 4-6, pp. 2-16). Mr. Murdoch alleged that his disability began on November 30, 2019. (Doc. 4-6, p. 2). The Commissioner denied Mr. Murdock's claims on July 1, 2021, and Mr. Murdock requested a hearing before an ALJ. (Doc. 4-5, p. 8). Mr. Murdock and his attorney attended a telephone hearing before the ALJ on January 18, 2023. (Doc. 4-3, pp. 20, 45-63).[3] A vocational expert testified at the hearing. (Doc. 4-3, pp. 58-62).

The ALJ issued an unfavorable decision on May 17, 2023. (Doc. 4-3, pp. 20-37). On November 6, 2023, the Appeals Council declined Mr. Murdock's request for review, (Doc. 4-4, p. 17), making the Commissioner's decision a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

---

[3] Mr. Murdock and his attorney appeared in person at the Social Security office, and the ALJ participated in the hearing via telephone conference. (Doc. 4-3, pp. 47-48).

## EVIDENCE IN THE ADMINISTRATIVE RECORD[4]

### *Mr. Murdock's Medical Records*

To support his application, Mr. Murdock relied on medical records relating to the diagnosis and treatment of right shoulder rotator cuff repair, degenerative joint disease of the bilateral shoulders, status post total left knee arthroplasty with revision, degenerative joint disease of the right knee, bilateral osteoarthritis of the knees, obesity, obstructive sleep apnea, diabetes mellitus, polycythemia, peptic ulcer disease, acute kidney injury, COVID-19 infection, hypertension, and hyperlipidemia.[5] The Court has reviewed Mr. Murdock's complete medical history and summarizes the following medical records because they are most relevant to Mr. Murdock's arguments in this appeal.

On May 7, 2015, Mr. Murdock saw orthopedic surgeon Dr. William Haller for treatment for degenerative joint disease. (Doc 4-8, pp. 16-19). Dr. Haller noted that Mr. Murdock previously had "ACL reconstruction" surgery "after trauma to the [left] knee" and "slowly developed osteoarthritic changes." (Doc. 4-8, p. 16). Mr. Murdock had joint swelling, pain, tenderness, and normal alignment, strength, and

---

[4] In his brief, Mr. Murdock adopted the ALJ's description of his age, education, and work experience and the ALJ's summary of his (Mr. Murdock's) testimony. (Doc. 8, p. 4).

[5] Polycythemia is "type of blood cancer" that "causes your bone marrow to make too many red blood cells . . . [P]roper medical care can help ease signs, symptoms, and complications of this disease." *See* https://www.mayoclinic.org/diseases-conditions/polycythemia-vera/symptoms-causes/syc-20355850 (last visited Nov. 19, 2024).

range of motion in his left knee; intact sensation; normal muscle tone in his legs; and a normal gait.  (Doc. 4-8, pp. 16-17).  Dr. Haller indicated that he had treated Mr. Murdock's left knee problems with a "home exercise program, medications[,] and injections without resolution."  (Doc. 4-8, pp. 16, 18).  Dr. Haller recommended a left total knee arthroplasty and physical therapy.  (Doc. 4-8, p. 18).

On May 12, 2015, Dr. Haller began Mr. Murdock's total left knee replacement surgery but had to stop when Mr. Murdock experienced cardiac arrest.  (Doc. 4-8, pp. 22-23, 26-27).  A post-operative EKG revealed normal sinus rhythm with no acute changes.  (Doc. 4-8, p. 24).  Mr. Murdock's post-operative diagnoses included degenerative joint disease in his left knee, cardiac arrest, and acute post-operative pain.  (Doc. 4-8, p. 26).  Dr. Haller noted that Mr. Murdock's cardiac arrest was most likely related to hypertension medication prescribed by his primary care doctor.  (Doc. 4-8, p. 25).  Mr. Murdock received an adductor canal block for his post-operative knee pain.  (Doc. 4-8, p. 28).[6]

On May 19, 2015, Dr. Haller completed Mr. Murdock's left knee replacement surgery with no complications.  (Doc. 4-8, pp. 13-15).  Mr. Murdock received another nerve block for post-surgery knee pain.  (Doc. 4-8, p. 11).  Mr. Murdock was "orthopedically stable" during his three-day hospital stay.  (Doc. 4-8, p. 10).

---

[6]  An adductor canal block is a "pure sensory nerve block for postoperative analgesia following knee surgery."  *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC5466855/ (last visited Nov. 19, 2024).

Dr. Haller recommended home health care physical therapy until Mr. Murdock could drive. (Doc. 4-8, p. 10).

On April 6, 2016, Mr. Murdock saw Dr. Haller and complained of a "little pain" in his left knee with deep flexion. (Doc. 4-8, pp. 98, 100). Mr. Murdock also complained of increased right knee pain, decreased function and activity, and inability to walk long distances without a cane. (Doc. 4-8, p. 98). Dr. Haller noted that Mr. Murdock had had meniscus surgery eight years earlier on his right knee. (Doc. 4-8, p. 98). Mr. Murdock's left knee examination was "[w]ithin normal limits." (Doc. 4-8, pp. 98-99). He had pain and tenderness in his right knee, but Dr. Haller noted that Mr. Murdock's physical examination otherwise was normal. (Doc. 4-8, pp. 98-99). An x-ray of Mr. Murdock's right knee showed "moderate to severe medial compartment degeneration, mild to moderate lateral com[]partment degeneration," and "mild spurring" in his joint. (Doc. 4-8, p. 99). Dr. Haller determined that Mr. Murdock had degenerative joint disease in his right knee and possible bursitis in his left knee. (Doc. 4-8, pp. 99-100). Dr. Haller prescribed Meloxicam and aspirin for pain. (Doc. 4-8, p. 100).

Mr. Murdock saw Dr. Haller on July 6, 2016 and complained of left knee pain. (Doc. 4-8, p. 96). Mr. Murdock's left knee examination was normal, and Dr. Haller noted that he did not have a "great explanation" for Mr. Murdock's left knee pain.

(Doc 4-8, p. 96).  Dr. Haller prescribed Tramadol for pain and ordered a bone scan. (Doc. 4-8, pp. 96-97).

On July 21, 2016, Mr. Murdock returned to Dr. Haller and reported pain in his left knee when he walked and "tr[ied] to do deep flexion." (Doc. 4-8, p. 94). The bone scan showed a "loosening" of the left knee because "it never achieved complete ingrowth." (Doc. 4-8, pp. 92, 94).  Dr. Haller noted that Mr. Murdock was "managing reasonably well," that "promising a better outcome with regard to pain or ROM [was] hard to do," and that Dr. Haller needed to rule out infection.  (Doc. 4-8, p. 94).  At an August 11, 2016 visit, Dr. Haller noted Mr. Murdock's labs were normal with no signs of infection.  (Doc. 4-8, pp. 90, 92).  Dr. Haller stated that Mr. Murdock's options included a revision left knee replacement surgery that Dr. Haller thought would make Mr. Murdock's pain better but was "less likely" to improve range of motion in the left knee.  (Doc. 4-8, p. 92).  At a September 7, 2016 visit, Mr. Murdock complained of left knee pain; he had reduced range of motion, joint swelling, and stiffness in his left knee.    (Doc. 4-8, pp. 86-87).    Dr. Haller recommended revision surgery that would include revising "both components" of the left knee and ordered physical therapy focused on gait training, endurance, range of motion, and strengthening muscles.  (Doc. 4-8, p. 88).  Mr. Murdock indicated that he wanted the revision surgery to "get some pain relief." (Doc. 4-8, pp. 88, 90).

On December 6, 2016, Dr. Haller performed Mr. Murdock's left knee revision surgery. (Doc. 4-8, p. 84). At a December 22, 2016 post-op visit, Mr. Murdock reported "some throbbing pains" and difficulty bending. (Doc. 4-8, p. 84). An x-ray of Mr. Murdock's left knee showed that the implants were in a "good position with no evidence of subsidence[,] loosening[,] or wear." (Doc. 4-8, p. 84). Dr. Haller continued physical therapy and ice therapy and prescribed Percocet for pain. (Doc. 4-8, pp. 84-85). At a visit on January 12, 2017, Dr. Haller noted that Mr. Murdock had progressed in his recovery but needed to continue physical therapy to aggressively work on range of motion. (Doc. 4-8, p. 82). On February 1, 2017, Dr. Haller ordered Mr. Murdock to go to physical therapy two to three times per week for four weeks. (Doc. 4-8, p. 81). Dr. Haller noted on February 15, 2017 that Mr. Murdock had improved, was doing well, and was "much happier" at the visit. (Doc. 4-8, p. 79). Mr. Murdock's left knee was normal, and he "achieved full extension" in his left knee. (Doc. 4-8, p. 79). Dr. Haller continued physical therapy and prescribed Cyclobenzaprine to take as needed for muscle spasms. (Doc. 4-8, p. 79). At a March 15, 2017 visit, Dr. Haller noted that Mr. Murdock had improved, had increased function in his left knee, and was "likely to do even better." (Doc. 4-8, p. 77). Mr. Murdock reported that he was pleased with his progress. (Doc. 4-8, p. 77). Dr. Haller prescribed Norco for pain and continued physical therapy. (Doc. 4-8, pp. 67, 77).

On August 31, 2017, Mr. Murdock saw Dr. Haller and reported that he was doing well, that his "pain [was] much improved with weight bearing," that he had increased function, and that he had limited flexion in his left knee. (Doc. 4-8, p. 60). Mr. Murdock had pain and tenderness, normal strength and extension, and intact sensation in his left knee. (Doc. 4-8, p. 60). He had a normal gait. (Doc. 4-8, p. 60). An x-ray showed well-positioned implants "with no evidence of loosening or wear." (Doc. 4-8, p. 61). Dr. Haller recommended that Mr. Murdock continue home exercises for range of motion and strengthening, walk daily, and increase his activity level. (Doc. 4-8, p. 61).

On November 29, 2017, Mr. Murdock reported pain in his left knee "to the point of being unable to work." (Doc. 4-8, pp. 43, 46). An x-ray of Mr. Murdock's left knee was normal. (Doc. 4-8, p. 43). Dr. Haller noted that on exam, Mr. Murdock "seem[ed] to be reasonably functional with the exception of his knee flexion limits" and that "[u]nfortunately there [was] no good explanation" for Mr. Murdock's left knee pain. (Doc. 4-8, p. 44).

Nearly one year later, on September 17, 2018, Mr. Murdock saw Dr. Mary Rutherford at Southern Immediate Care and reported persistent throbbing in his left knee and pain in his right knee. Mr. Murdock did not have difficulty walking. (Doc. 4-8, pp. 185, 186, 187). Mr. Murdock stated that he was seeing Dr. Haller and that Dr. Haller said "'he wouldn't touch [Mr. Murdock's] knee again.'" (Doc. 4-8, p.

186).  Mr. Murdock asked to see a new orthopedic doctor for his right knee.  (Doc. 4-8, p. 186).  Dr. Rutherford noted that Mr. Murdock had limited range of motion in his musculoskeletal system but did not specify which area.  (Doc. 4-8, p. 187).  Dr. Rutherford referred Mr. Murdock to an orthopedic doctor for his right knee pain.  (Doc. 4-8, p. 187).

Mr. Murdock saw Dr. Bernard Simieritsch at Quality of Life Health Services on January 15, 2019 and reported chronic right knee pain at 7/10.  (Doc. 4-9, pp. 3, 8, 11).  Mr. Murdock indicated that he did not have medical insurance and needed to "find a new primary care provider to care for him without insurance."  (Doc. 4-9, p. 5).  Mr. Murdock reported extremity weakness and numbness and a disturbed gait.  (Doc. 4-9, p. 7).  On physical examination, Mr. Murdock had an unstable right knee with chronic pain "with use" and an asymptomatic left knee.  (Doc. 4-9, pp. 7-8).  Dr. Simieritsch prescribed Meloxicam for pain.  (Doc. 4-9, p. 10).

At a February 15, 2019 visit, Mr. Murdock reported chronic pain in both knees with weight-bearing and limited range of motion; he rated his pain at 0/10 at the visit.  (Doc. 4-9, pp. 12, 16).  Mr. Murdock reported a sedentary lifestyle, but notes from the visit indicate that Mr. Murdock exercised daily.  (Doc. 4-9, p. 14).  Dr. Simieritsch noted that Mr. Murdock had tenderness and moderately reduced range of motion in his knees and marked restriction to flexion in his left knee, and Mr.

Murdock walked with a limp.  (Doc. 4-9, pp. 16-17).  Dr. Simieritsch continued

Meloxicam and referred Mr. Murdock to a pain clinic.  (Doc. 4-9, p. 17).

On April 17, 2019, Mr. Murdock saw Dr. Smithson Ahiabuike at Quality of

Life Health Services.  (Doc. 4-9, pp. 19, 26).  Mr. Murdock described his chronic

knee pain as "mild-moderate" but rated his pain at 8/10 at the visit.  (Doc. 4-9, pp.

19, 23).  He stated that bending, moving, walking, and standing aggravated his pain,

and rest relieved it.  (Doc. 4-9, p. 19).  Mr. Murdock reported a disturbed gait,

decreased mobility, difficulty falling asleep, joint pain and tenderness, muscle

weakness, and muscle spasms.  (Doc. 4-9, pp. 19, 22-23).  Dr. Ahiabuike noted

weakness in Mr. Murdock's left knee and tenderness in his right knee.  (Doc. 4-9, p.

24).  Dr. Ahiabuike recommended "no heavy lifting or repetitive motions" and

continued Meloxicam.  (Doc. 4-9, pp. 24-26).

Mr. Murdock saw CRNP Phillip Rogers at Quality of Life Health Services on

September 6, 2019 and complained of left knee pain that he described as "aching

and dull," decreased mobility, and joint pain.  (Doc. 4-9, pp. 28, 32, 34).  Mr.

Murdock rated his pain at 0/10 at the visit.  (Doc. 4-9, pp. 32-33).  Mr. Murdock

stated that he had "[f]air [c]ontrol" of his left knee pain, that walking and standing

aggravated his pain, and that he did not have joint tenderness or swelling.  (Doc. 4-

9, pp. 28, 33).  CRNP Rogers noted that Mr. Murdock had tenderness and mild pain

with motion in his right shoulder and left knee.  (Doc. 4-9, p. 33).  Mr. Murdock

requested pain medication because he could not afford to go to the pain clinic.  (Doc. 4-9, p. 28).  CRNP Rogers continued Meloxicam for pain.  (Doc. 4-9, p. 34).[7]

Eighteen months later, at an April 13, 2021 visit with Dr. Kathryn Peilen at Quality of Life Health Services, Mr. Murdock reported chronic left knee and right shoulder pain that he rated at 6/10.  (Doc. 4-9, pp. 103, 106, 107, 110).  Mr. Murdock had mildly reduced range of motion in his lumbar spine, tenderness, and moderate pain with motion in his right shoulder and "severely reduced" range of motion in his left knee.  (Doc. 4-9, pp. 107-108).  Dr. Peilen recommended increased activity, and she continued Meloxicam for pain.  (Doc. 4-9, pp. 108-109).

On July 5, 2021, Mr. Murdock saw Dr. Pascual Herrera at Quality of Life Health Services and complained of shoulder and knee pain.  (Doc. 4-10, p. 3).  Mr. Murdock reported joint pain and stiffness, back pain, an abnormal gait, joint swelling, and muscle pain.  (Doc. 4-10, p. 3).  Dr. Herrera noted that Mr. Murdock had "tenderness, deformity, and signs of injury" in his musculoskeletal system; pain in his right shoulder joint; and swelling in his left lower leg.  (Doc. 4-10, p. 4).  Dr. Herrera referred Mr. Murdock to an orthopedic surgeon.  (Doc. 4-10, p. 4).  At a follow-up on September 7, 2021, Dr. Herrera noted that Mr. Murdock had bony

---

[7] CRNP Rogers's notes indicate a July 31, 2019 prescription for gabapentin for nerve pain.  (Doc. 4-9, p. 34).  The Court cannot locate medical records for a July 31, 2019 visit.  Notes from a January 2021 visit indicate that Mr. Murdock was prescribed gabapentin in July 2019, but he did not use it, and the prescription stopped in January 2021.  (Doc. 4-9, pp. 54-55).

tenderness, decreased ranged of motion, and tenderness in both knees and deformity and tenderness in his lower legs.  (Doc. 4-10, pp. 8-9).  Dr. Herrera diagnosed Mr. Murdock with primary osteoarthritis of both knees.  (Doc 4-10, p. 9).  On October 19, 2021, Mr. Murdock returned to Dr. Herrera and complained of right shoulder and right knee pain.  (Doc. 4-10, p. 17).  Dr. Herrera noted that Mr. Murdock had a normal range of motion in his musculoskeletal system.  (Doc. 4-10, p. 18).  Mr. Murdock requested a referral to a UAB orthopedic surgeon, and Dr. Herrera noted he would "[c]onsult ortho."  (Doc. 4-10, pp. 17, 19).

On November 12, 2021, Mr. Murdock saw CRNP Jessica Balik at UAB Kirklin Clinic for an orthopedic evaluation of his right shoulder pain.  (Doc. 4-10, p. 30).[8]  Mr. Murdock described his shoulder pain as constant and throbbing and rated his pain at 8/10.  (Doc. 4-10, pp. 30, 32).  Mr. Murdock reported right shoulder pain with overhead motion and external rotation but no significant limitation in range of motion.  (Doc 4-10, p. 30).  Shen she examined Mr. Murdock, CRNP Balik noted tenderness to palpation "along the anterior aspect of the [right] shoulder and along the biceps tendon," no joint tenderness, and positive Hawkins, Jobe's and Speed's tests.  (Doc. 4-10, pp. 32-33).[9]  X-rays showed "no acute fracture or dislocation

---

[8]  Dr. Utkarsh Rai signed the medical notes as the acting clinical documentation associate for CRNP Balik.  (Doc. 4-10, p. 33).  Dr. Elie Ghanem also co-signed the medical notes.  (Doc. 4-10, p. 33).

[9]  A positive Hawkins test means the patient has pain with internal rotation of the shoulder.  *See* https://www.physio-pedia.com/Hawkins_/_Kennedy_Impingement_Test_of_the_Shoulder   (last

identified in the right shoulder. . . [and] mild degenerative changes of the acromioclavicular and glenohumeral joints." (Doc 4-10, pp. 33-34). Mr. Murdock received a corticosteroid injection in his right shoulder for pain. (Doc. 4-10, p. 35). CRNP Balik recommended physical therapy, but because Mr. Murdock could not afford therapy, CRNP Balik gave him a six-week home exercise program. (Doc. 4-10, p. 30).

Mr. Murdock visited Dr. Thomas Page at the Etowah Free Community Clinic on December 5, 2021 for medication refills. (Doc. 4-10, pp. 41-42). Mr. Murdock had decreased flexibility in his right knee. (Doc. 4-10, p. 43). Dr. Page referred Mr. Murdock to "UAB charity care" for his right shoulder and noted that an orthopedic doctor at UAB needed to evaluate Mr. Murdock's bilateral knee pain. (Doc. 4-10, pp. 43-44). Dr. Page refilled Mr. Murdock's Meloxicam prescription. (Doc. 4-10, pp. 42-43).

Mr. Murdock returned to CRNP Balik on March 3, 2022 and complained of right shoulder pain, limited range of motion, and weakness. (Doc. 4-10, p. 97). Mr. Murdock had tenderness to palpation in his right shoulder and positive Hawkins, Jobe's, and Speed's tests. (Doc. 4-10, p. 100). An x-ray of his shoulder showed "no

---

visited Nov. 19, 2024). A positive Jobe's test indicates weakness and pain in the shoulder, "which would indicate a tear of the supraspinatus muscle or tendon[] or a neuropathy of the suprascapular nerve." *See* https://www.physio-pedia.com/Empty_Can_Test (last visited Nov. 19, 2024). A positive Speed's test indicates "pain localized to the bicipital groove or bicipital tendon." *See* https://www.physio-pedia.com/Speeds_Test (last visited Nov. 19, 2024).

fracture or malalignment," "[m]ild AC joint degenerative changes," and "[b]ony excrescence extending from the inferior glenoid [that] could be related to trauma." (Doc. 4-10, pp. 100, 102). An March 14, 2022 MRI of his right shoulder showed a "[c]omplete tear of the supraspinatus tendon with retraction to the acromion," "[p]artial-thickness interstitial tear versus high-grade tendinosis of the long head biceps tendon at the rotator interval," "[g]anglion cysts at the myotendinous junction of the infraspinatus," and "[m]ild degenerative changes of the acromioclavicular joint." (Doc. 4-10, pp. 95-96). During a telehealth visit on March 16, 2022, CRNP Balik discussed the MRI results with Mr. Murdock and referred him to Sports Medicine Surgery for further evaluation. (Doc. 4-10, pp. 93, 95-96).

On March 16, 2022, Mr. Murdock saw Dr. Thomas Evely at UAB for evaluation of his right shoulder. (Doc. 4-10, p. 89). Dr. Evely noted the MRI results and recommended a "right shoulder arthroscopy, debridement, arthroscopic biceps tendinosis, and arthroscopic rotator cuff repair." (Doc. 4-10, p. 92). On March 29, 2022, Dr. Evely and Dr. Reed Butler performed surgery on Mr. Murdock's right shoulder at UAB. (Doc. 4-10, pp. 104-105). At an April 13, 2022 follow up, Dr. Evely noted that Mr. Murdock was doing well overall but had a "bit of pain" in the right shoulder and "some spasming in the biceps." (Doc. 4-10, p. 124). Mr. Murdock's incisions were clean with no infection, and he had intact pulse, nerve function, and sensation. (Doc. 4-10, p. 126). Dr. Evely noted that Mr. Murdock's

pain was "moderately controlled," and he refilled Mr. Murdock's Norco prescription and prescribed Flexeril. (Doc. 4-10, pp. 125, 127). On May 11, 2022, Dr. Evely noted that Mr. Murdock was doing well overall but could not afford physical therapy. (Doc. 4-10, pp. 112, 114). Dr. Evely indicated that he would have a local physical therapist prepare a home exercise program for Mr. Murdock. (Doc. 4-10, p. 114). On June 22, 2022, Dr. Evely again noted that Mr. Murdock was "overall doing very well 3 months status post rotator cuff repair," was doing some exercises at home, and did not have new complaints. (Doc. 4-11, pp. 69, 71-72).

On November 30, 2022, Mr. Murdock saw Dr. Evely and reported that his shoulder was "doing very well . . . with minimal pain." (Doc. 4-11, p. 76). Mr. Murdock complained of pain and "mechanical type symptoms" like buckling and "giving way" in his right knee. (Doc. 4-11, p. 76). Mr. Murdock had tenderness over the medial joint, "full range of motion with patellofemoral crepitus," normal straight leg raise test with "no palpable defects in quadriceps or patellar tendons," and "positive" meniscus in his right knee. (Doc. 4-11, pp. 78-79). Mr. Murdock had an antalgic gait. Doc. 4-11, p. 78). X-rays of his right knee showed "[n]o acute fracture or dislocation," mild to "[m]oderate tri-compartmental degenerative changes," "[n]o significant joint effusion," and "[m]ultiple wire fragments projecting over the proximal tibia and fibula head." (Doc. 4-11, pp. 73, 79). Dr. Evely recommended an MRI of Mr. Murdock's right knee. (Doc. 4-11, p. 79).

A December 7, 2022 MRI of Mr. Murdock's right knee revealed a "[d]egenerative signal in the menisci without tear," "[m]ild chondromalacia of the patella," and [p]ostsurgical changes in the proximal tibia and tibiofibular joint." (Doc. 4-11, p. 74). At a December 22, 2022 visit, Dr. Evely explained to Mr. Murdock that the MRI "demonstrate[ed] mild to moderate degenerative changes at the right knee with no discrete meniscus tear." (Doc. 4-11, p. 83). According to Dr. Evely, a right knee replacement would not significantly improve Mr. Murdock's symptoms. (Doc. 4-11, p. 83). Dr. Evely recommended non-operative treatments such as injections and home exercises. He gave Mr. Murdock another corticosteroid injection in his right knee. (Doc. 4-11, p. 83).

### Dr. Alvin Tenchavez's Consultative Examination

On June 1, 2021, at the request of the Social Security Administration, Dr. Tenchavez reviewed medical records the Disability Determination Service provided and examined Mr. Murdock. (Doc. 4-9, pp. 115-121). Mr. Murdock reported that he worked at Buffalo Rock Sales for 22 years and had not been able to work since 2016. He stated that he had degenerative joint disease and osteoarthritis in his knees. (Doc. 4-9, p. 115). He indicated that he had "six to seven surgeries on his left knee" and had surgery on his right knee "at the age of five when he was hit by the handlebar of a bicycle." (Doc. 4-9, p. 115). He stated that his left knee issues caused right hip pain, but he had not sought treatment for hip pain. (Doc. 4-9, p. 115). Mr. Murdock

stated that he had right shoulder pain for years that he attributed to "his work at Buffalo Rock Sales." (Doc. 4-9, p. 115). Mr. Murdock reported that he had not had "diagnostic work up or therapeutic intervention" for his shoulder pain because of "financial constraints." (Doc. 4-9, p. 115).[10]

On physical examination, Mr. Murdock had normal range of motion in his cervical and lumbar spine, hips, knees, ankles, shoulders, and arms. (Doc. 4-9, pp. 120-21). Dr. Tenchavez noted that Mr. Murdock had crepitus in his right knee, had normal "heel-knee-shin testing," normal deep tendon reflexes in his arms and legs, and 5/5 strength in all muscle groups. (Doc. 4-9, pp. 118-19). Mr. Murdock could heel, toe, and tandem walk; could stoop and rise on his knees; and had a negative straight leg test in both legs in the sitting and supine position. (Doc. 4-9, p. 118). Mr. Murdock walked without an assistive device. (Doc. 4-9, p. 119). Mr. Murdock could make fists, oppose thumb to fingers, tie shoelaces, pick up small objects, button, hold a glass, and turn a doorknob. (Doc. 4-9, pp. 118-119). Dr. Tenchavez's diagnoses included osteoarthritis in both knees, "[c]hronic right shoulder pain by history," and "[c]hronic right hip pain by history." (Doc. 4-9, p. 119).

---

[10]  Dr. Tenchavez examined Mr. Murdock before his March 2022 right shoulder surgery.

### *Mr. Murdock's Function Reports*

At the request of the Social Security Administration, Mr. Murdock completed function reports on January 6 and September 3, 2021. (Doc. 4-7, pp. 20-28).[11] Mr. Murdock reported that he lived in an apartment with his wife. (Doc. 4-7, p. 20).

Mr. Murdock reported that degenerative joint disease and arthritis in his knees caused pain, swelling, and balance issues. (Doc. 4-7, pp. 21, 28). He stated that "excessively overcompensating" for his left knee caused right knee and hip pain. (Doc. 4-7, p. 20). Mr. Murdock indicated that he needed right knee replacement surgery, but he did not have insurance "to seek medical attention." (Doc. 4-7, p. 20). Mr. Murdock stated that he was in constant pain that he rated at 8/10 "most days" and 10/10 on "other" days. (Doc. 4-7, p. 20).

Mr. Murdock indicated that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, follow instructions, and get along with others. (Doc. 4-7, p. 26). He stated that he walked with a limp and could walk for five to ten minutes at a time before he needed to rest for 10 to 15 minutes. (Doc. 4-7, pp. 20, 26). He stated that his doctor prescribed a cane after his left knee replacement surgery, that he used a cane when needed, and that he used an electric scooter to shop. (Doc. 4-7, pp. 27,

---

[11] Mr. Murdock completed both function reports before his March 2022 shoulder surgery.

58). Mr. Murdock reported that he could not lift more than 30 to 35 pounds because of his knees and right shoulder. (Doc. 4-7, pp. 21, 57).

On a typical day, Mr. Murdock stated that he got up, took care of his personal hygiene, ate his first meal around 11:00 a.m., took his medications, walked his dog, watched television, and went to bed at 11:00 p.m. or 12:00 a.m. (Doc. 4-7, pp. 22, 53). He indicated that he tossed and turned all night and had sleep apnea. (Doc. 4-7, pp. 22, 28). He stated that he had some difficulty getting into the bathtub without help, but he had no other problems with personal care. (Doc. 4-7, pp. 23, 53). His wife reminded him to groom and take his medications. (Doc. 4-7, p. 23). Mr. Murdock reported that he went outside four to five times a day for ten minutes at a time to walk the dog. (Doc. 4-7, p. 55). He stated that his hobbies included watching football on the television. (Doc. 4-7, p. 56).

Mr. Murdock stated that his wife prepared his meals because he could not stand for long. (Doc. 4-7, pp. 23, 54). Mr. Murdock stated that he did not do house or yard work because standing, walking, squatting, and bending caused pain; that he rarely went out on his own because he might fall; and that his wife drove him around, but he could drive if necessary. (Doc. 4-7, pp. 23-24, 54-55). Mr. Murdock indicated that he could not pay bills, handle a savings account, or use a checkbook or money orders, but he could count change. (Doc. 4-7, pp. 24, 55). He reported

that he did not spend time with anyone other than his wife because he lost all interest in socializing because of his depression and COVID-19. (Doc. 4-7, p. 25).

Mr. Murdock stated that he sometimes had problems getting along with people and that crowds aggravated him. (Doc. 4-7, pp. 56-57). He reported that written instructions aggravated him, but he followed spoken instructions "okay." (Doc. 4-7, pp. 26, 57). He stated that he did not handle stress or changes in routine well. (Doc. 4-7, pp. 27, 58).

### *Mr. Murdock's Wife's Third-Party Function Report*

Mr. Murdock's wife, Cathy C. Murdock, completed a third-party function report on September 2, 2021. (Doc. 4-7, pp. 41-51).[12] Ms. Murdock's function report mirrored Mr. Murdock's report in most respects. (Doc. 4-7, pp. 41-51). She stated that Mr. Murdock was in constant chronic pain in his knees and shoulder from lifting at Buffalo Rock for 24 years. (Doc. 4-7, p. 42). She reported that Mr. Murdock's impairments affected his ability to work because he could not stand, walk, kneel, lift, and squat without pain; could not kneel or squat at all; walked with a limp; and could not straighten his left leg. (Doc. 4-7, p. 41). Ms. Murdock indicated that Mr. Murdock used a cane. (Doc. 4-7, p. 48). She stated they took small walks around the neighborhood for exercise but did not have visitors, attend

---

[12]  Ms. Murdock completed her third-party function report before Mr. Murdock's March 2022 shoulder surgery.

events, take vacations, or socialize with others because of COVID-19.  (Doc. 4-7, p. 42).  Ms. Murdock noted that Mr. Murdock's chronic pain caused a major personality transformation in him, and he became moody, anxious, short-tempered, depressed, and stressed.  (Doc. 4-7, p. 42).

Ms. Murdock stated that that she and Mr. Murdock moved from their house to an apartment because Mr. Murdock could not take care of the lawn or maintain a house.  (Doc. 4-7, p. 44).  She took over their finances because Mr. Murdock was forgetful, did not remember change, did not check for accuracy, and showed no interest in mail or due dates.  (Doc. 4-7, pp. 45-46).  Ms. Murdock stated that Mr. Murdock lost all interest in everything including television programs and reading. (Doc. 4-7, p. 46).  She stated that Mr. Murdock occasionally went to their daughter's house to visit.  (Doc. 4-7, p. 46).

### *Mr. Murdock's Administrative Hearing*

Mr. Murdock's administrative hearing took place via telephone on January 19, 2023. (Doc. 4-3, pp. 45-63).  Mr. Murdock testified that he had about eight surgeries on both his knees and stated that he had a second left knee replacement surgery because he "had a loose knee."  (Doc. 4-3, p. 51).  He indicated that his knee issues were mainly due to arthritis.  (Doc. 4-3, p. 51).  Mr. Murdock testified that he could not work because of pain in his knees, shoulders, and right hip.  (Doc. 4-3, p. 55).  Mr. Murdock stated that the pain in both of his knees was "probably a[n] eight

or ten every day when [he] walk[ed]." (Doc. 4-3, p. 52). He explained that he used a cane according to how he felt. (Doc. 4-3, p. 52).[13] Mr. Murdock indicated that he could stand or walk for 20 minutes before he needed to sit down; if he stood still too long, his knees stiffened, and he could not move. (Doc. 4-3, p. 55). Mr. Murdock testified that he could not squat, get on his knees, or get on the floor and get back up and that he had difficulty bending at the waist. (Doc. 4-3, p. 56).

Mr. Murdock testified that he had surgery on his right shoulder and that his shoulder was not "back to normal." (Doc. 4-3, p. 53). He stated that he could not reach up and could lift at most 20 to 25 pounds with both hands. (Doc. 4-3, p. 53). Mr. Murdock stated that he believed his left shoulder had a torn muscle. (Doc. 4-3, p. 53).

Mr. Murdock testified that he sat in a chair most of the day and walked the dog about four or five times a day. (Doc. 4-3, p. 56). He stated that he seldom vacuumed, that his wife did most of the cooking, and that he could drive. (Doc. 4-3, pp. 56-57). Mr. Murdock indicated that he did not need help dressing or getting in and out of the tub until he became weak from his COVID-19 hospital stay. (Doc. 4-3, p. 57). Mr. Murdock stated that he did not have side effects from his medications. (Doc. 4-3, p. 57).

_____

[13] At the time of the hearing, Mr. Murdock used a walker after his release from a two-week hospital stay because of COVID-19. (Doc. 4-3, p. 52).

Pamela Scalf testified as a vocational expert. (Doc. 4-3, p. 58). Ms. Scalf classified Mr. Murdock's past work as a sales route driver as medium work but performed at the very heavy exertional level. (Doc. 4-3, p. 59).

The ALJ asked Ms. Scalf to consider the work available to an individual with the same education, training, and work experience as Mr. Murdock, who could perform light work with the following limitations:  could climb ramps and stairs; must avoid ladders, ropes, and scaffolds; occasionally could balance and stoop; could not kneel, crouch, or crawl; occasionally could reach overhead; could have occasional exposure to extreme cold and vibration; should avoid unprotected heights, moving mechanical parts, and dangerous machinery; and must alternate sitting and standing every 30 minutes throughout the workday as needed. (Doc. 4-3, p. 59). Ms. Scalf stated that an individual with those limitations could not perform Mr. Murdock's past work.  (Doc. 4-3, pp. 59-60).  Ms. Scalf testified that the hypothetical individual could perform light, unskilled work as a cashier II, with approximately 132,000 available jobs nationally; an office helper, with approximately 10,000 available jobs nationally; and a mail sorter, with approximately 53,000 available jobs nationally. (Doc. 4-3, p. 60). Ms. Scalf stated that the number of available jobs she cited reflected a reduced number because of the sit and stand option. (Doc. 4-3, p. 60).

Ms. Scalf testified that more than one absence a month consistently would preclude all work. (Doc. 4-3, pp. 60-61).[14]  Ms. Scalf stated that an individual who was off task more than 10 percent of the day could not work. (Doc. 4-3, p. 61).

## THE ALJ'S DECISION

The ALJ found that Mr. Murdock had not engaged in substantial gainful activity between the alleged onset date of November 30, 2019 through the date he was last insured on December 31, 2022. (Doc. 4-3, p. 22). The ALJ determined that Mr. Murdock suffered from the severe impairments of status post right shoulder rotator cuff repair, degenerative joint disease of the bilateral shoulders, status post total knee arthroplasty of the left knee with revision, degenerative joint disease of the right knee, bilateral osteoarthritis of the knees, obesity, obstructive sleep apnea, and diabetes mellitus. (Doc. 4-3, p. 22). The ALJ also determined that Mr. Murdock had the non-severe impairments of polycythemia, peptic ulcer disease, acute kidney injury, COVID-19 infection, hypertension, and hyperlipidemia. (Doc. 4-3, p. 22). The ALJ found that Mr. Murdock's chest pain was not a medically determinable impairment. (Doc. 4-3, pp. 28-29). Based on a review of the medical evidence, the ALJ concluded that, through the date he was last insured, Mr. Murdock did not have an impairment or a combination of impairments that met or medically equaled the

---

[14]  The transcript indicates that Ms. Scalf testified that chronic absenteeism would be more than one absence a month "more than eight times a day." (Doc. 4-3, p. 61). The reference to "day" appears to be in error and most likely should be "more than eight times a year."

severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 4-3, p. 29).

Considering Mr. Murdock's impairments, the ALJ evaluated Mr. Murdock's residual functional capacity. (Doc. 4-3, p. 29). The ALJ determined that Mr. Murdock had the RFC to:

> perform light work. . . except [he could] occasionally climb ramps or stairs but [could] never climb ladders, ropes, or scaffolds. [He could] occasionally balance and stoop[;] . . .[could not] kneel, crouch, or crawl[;] . . . [could] reach overhead on an occasional basis[;] . . . [could] have occasional exposure to extreme cold and vibration[;] . . . [and] must avoid all exposure to unprotected heights, moving, mechanical parts, and dangerous machinery. [He] must alternate sitting and standing every 30 minutes throughout the workday as needed for a brief change of position but without leaving the workstation.

(Doc. 4-3, p. 29).

Based on this RFC and relying on the testimony from the vocational expert, the ALJ concluded that Mr. Murdock could not perform his past work as a sales route driver. (Doc. 4-3, p. 35). Relying on testimony from the vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Mr. Murdock could perform including cashier II, office helper, and mail sorter. (Doc. 4-3, p. 36). Accordingly, the ALJ determined that Mr. Murdock was not disabled as defined by the Social Security Act. (Doc. 4-3, p. 37).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and his 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  *See* 42 U.S.C. § 405(g).  "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding.  Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."  *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *T-Mobile South, LLC v. Roswell*, 574 U.S. 293, 301 (2015), and *Consolidated Edison Co. v. NRB*, 305 U.S. 197, 229 (1938)) (emphasis omitted).  Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek*, 587 U.S. at 102 (quoting *Consolidated Edison Co.*, 305 U.S. at 229); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (same).   In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of

the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59); *see also Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2015) (same).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. That review is de novo. *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Mr. Murdock argues that the ALJ did not properly apply the pain standard and that substantial evidence does not support the ALJ's reasons for discrediting his statements regarding the limiting effects of his pain. (Doc. 8). The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*,

921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r of Soc. Sec.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r of Soc. Sec.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*). If the ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r of Soc. Sec.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r of Soc. Sec.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. The Commissioner must accept the claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541,

1545 (11th Cir. 1988); *Kalishek v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 868, 871

(11th Cir. 2012) (citing *Cannon*).

When a claimant relies on his testimony to establish a disabling impairment,

an ALJ must follow Social Security Regulation 16-3p. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms
> differently and may be limited by symptoms to a greater or lesser extent
> than other individuals with the same medical impairments, the same
> objective medical evidence, and the same non-medical evidence. In
> considering the intensity, persistence, and limiting effects of an
> individual's symptoms, we examine the entire case record, including
> the objective medical evidence; an individual's statements about the
> intensity, persistence, and limiting effects of symptoms; statements and
> other information provided by medical sources and other persons; and
> any other relevant evidence in the individual's case record.

SSR 16-3p, 2017 WL 5180304, at *4. Concerning the ALJ's burden to explain the

reasons for discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the
> individual's statements about his or his symptoms have been
> considered" or that "the statements about the individual's symptoms are
> (or are not) supported or consistent." It is also not enough . . . simply
> to recite the factors described in the regulations for evaluating
> symptoms. The determination or decision must contain specific reasons
> for the weight given to the individual's symptoms, be consistent with
> and supported by the evidence, and be clearly articulated so the
> individual and any subsequent reviewer can assess how the adjudicator
> evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10. In evaluating a claimant's reported

symptoms, an ALJ must consider:

> (i)    [the claimant's] daily activities;

(ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) [p]recipitating and aggravating factors;

(iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ found that Mr. Murdock's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," but the ALJ determined that Mr. Murdock's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the file." (Doc. 4-3, p. 30). In applying the pain standard, the ALJ discussed Mr. Murdock's medical records, (Doc. 4-3, pp. 30-34), and acknowledged that Mr. Murdock reported disabling left and right knee and right shoulder pain, (Doc. 4-3, p. 30, 31). The ALJ considered Dr. Tenchavez's June 20, 2021 consultative medical examination findings, (Doc. 4-3, pp. 32, 35), and Dr.

Reddy's June 2021 and Dr. Hogan's June 2022 RFC assessments that Mr. Murdock could perform a limited range of light work. (Doc. 4-3, p. 35). The ALJ considered Mr. Murdock's hearing testimony in assessing the persuasiveness of Dr. Reddy's and Dr. Hogan's opinions. (Doc. 4-3, p. 35). The ALJ stated that he "considered all [Mr. Murdock's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence" as required by SSR 16-3p. (Doc. 4-3, p. 29).

Mr. Murdock argues that in applying the pain standard, the ALJ "ignored, overlooked or misconstrued" evidence of Mr. Murdock's reports of debilitating knee and shoulder pain and that the ALJ did not discuss 2018 and 2019 medical records from Quality of Health showing that Mr. Murdock had limited range of motion, tenderness, and swelling in his knees. (Doc. 8, p. 14). Mr. Murdock is correct; in his opinion, the ALJ did not discuss medical records from 2018 and 2019 that document Mr. Murdock's knee pain. The ALJ limited his discussion of Mr. Murdock's left knee pain to a description of medical records dating from May 2015 to November 2017 and to a discussion of Dr. Tenchavez's 2021 consultative medical evaluation. (Doc. 4-3, pp. 30-32). The ALJ limited his discussion of Mr. Murdock's right knee pain to a description of Dr. Tenchavez's 2021 consultative medical evaluation and of medical records from November and December of 2022. (Doc. 4-

3, pp. 32-34). The ALJ also did not summarize Mr. Murdock's function report or his testimony at the hearing regarding his pain level.

The ALJ did not have to explicitly describe Mr. Murdock's records from 2018 and 2019 that reflect treatment for knee pain because "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" that would prevent this Court from determining whether the ALJ considered Mr. Murdock's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).[15] Under Eleventh Circuit precedent, the ALJ's statement that he considered all of Mr. Murdock's symptoms indicates "that the ALJ considered all necessary evidence." *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 949, 951-52 (11th Cir. 2014) (citing *Wilson*, 284 F.3d at 1224-25). If the ALJ did not consider the 2018 and 2019 records, the error is harmless.

This is so for several reasons. First, the Court has found only one medical record from 2018 relating to Mr. Murdock's knee and shoulder pain. After Mr. Murdock saw Dr. Haller in November 2017, he next complained to a physician of knee pain in September 17, 2018. On that visit with Dr. Rutherford at Southern Immediate Care, Mr. Murdock did not have difficulty walking. (Doc. 4-8, pp. 185,

---

[15] At an April 2019 medical visit, Mr. Murdock described his chronic knee pain as "mild-moderate" though he rated his pain at 8/10 at the visit. (Doc. 4-9, pp. 19, 23).

186, 187).  Mr. Murdock asked for a referral to a new orthopedic doctor for treatment of his right knee, and Dr. Rutherford accommodated the request.  (Doc. 4-8, pp. 186-87).

Second, Mr. Murdock's medical records from 2019 reflect consistent conservative treatment for knee pain.  Mr. Murdock saw Dr. Simieritsch at Quality of Life Health Services on January 15, 2019 and reported chronic right knee pain at 7/10.  (Doc. 4-9, pp. 3, 8, 11).  Though Dr. Simieritsch wrote that Mr. Murdock's right knee was unstable and that Mr. Murdock had chronic pain "with use," Dr. Simieritsch prescribed only Meloxicam for pain, the pain medication that Mr. Murdock took for years.  (Doc. 4-9, pp. 7-8, 10); *see* 20 C.F.R. § 404.1529(c)(3)(iv) (directing ALJ to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms").  At a February 15, 2019 visit with Dr. Simieritsch, Mr. Murdock walked with a limp and had a moderately reduced range of motion in his knees.  Dr. Simieritsch continued Meloxicam and referred Mr. Murdock to a pain clinic.  (Doc. 4-9, p. 17).  When Mr. Murdock saw Dr. Ahiabuike at Quality of Life Health Services in April 2019, Dr. Ahiabuike noted weakness in Mr. Murdock's left knee and tenderness in his right knee, recommended "no heavy lifting or repetitive motions," and continued Meloxicam.  (Doc. 4-9, pp. 24-26).  In September 2019, when Mr. Murdock saw CRNP Rogers at Quality of Life Health Services, Mr.

Murdock stated that he had "[f]air [c]ontrol" of his left knee pain and indicated that he could not afford to go to the pain clinic, (Doc. 4-9, p. 28). CRNP Rogers continued Meloxicam for pain. (Doc. 4-9, p. 34).

Third, Mr. Murdock rarely sought medical care for his knee and shoulder pain between November 2017 and April 2021. Though Mr. Murdock reported that by 2019, he had lost his medical insurance, he still saw doctors when he needed treatment for knee and shoulder pain, and he continued to receive treatment after April 2021 despite his lack of insurance. In December 2021, Mr. Murdock saw Dr. Page at the Etowah Free Community Clinic for medication refills. (Doc. 4-10, pp. 41-42). Dr. Page referred Mr. Murdock to UAB charity care and refilled Mr. Murdock's Meloxicam prescription. (Doc. 4-10, pp. 42-44). In March 2022, Mr. Murdock saw Dr. Evely at UAB for evaluation of his right shoulder. (Doc. 4-10, p. 89). Dr. Evely and Dr. Butler performed surgery on Mr. Murdock's right shoulder at UAB. (Doc. 4-10, pp. 104-105). At an April 2022 follow up, Dr. Evely noted that Mr. Murdock's pain was "moderately controlled," and he refilled Mr. Murdock's Norco prescription and prescribed Flexeril. (Doc. 4-10, pp. 125, 127). Thus, Mr. Murdock's sporadic medical treatment does not seem to be tied to his lack of medical insurance.

Taken together, the medical records from 2018 and 2019 that the ALJ did not describe in his opinion are relatively few, illustrate some fairly large gaps in medical care for knee pain, and reflect conservative treatment for pain.

Substantial evidence supports the ALJ's finding that Mr. Murdock's description of disabling pain is inconsistent with objective medical evidence. When Dr. Tenchavez evaluated Mr. Murdock in June 2021, he found that Mr. Murdock had normal "heel-knee-shin testing" in both legs; could heel, toe, and tandem walk; could "stoop and rise on [his] knees"; had normal straight leg raise testing in the seated and supine positions; had 5/5 muscle strength in all muscle groups; had normal range of motion in all extremities; and did not walk with an assistive device. (Doc. 4-3, p. 32) (citing Doc. 4-9, pp. 118-119)). November 2022 x-rays of Mr. Murdock's right knee showed "'mild to moderate' tricompartmental degenerative changes" with no joint swelling. Dr. Evely diagnosed "'mild right knee arthritis'" based on those x-ray findings. A December 2022 MRI showed "mild degenerative changes" in Mr. Murdock's right knee. (Doc. 4-3, pp. 33-34) (citing Doc. 4-11, pp. 73, 79, 83).

The ALJ's light work RFC determination with the sit/stand option accounted for Mr. Murdock's testimony regarding his ability to walk and stand 20 minutes before he needed to sit down despite his knee impairments, his self-reported ability

to lift 20 to 25 pounds despite his shoulder impairment, and his inability to squat because of his knee impairments.  (Doc. 4-3, pp. 29, 53, 55-56).

Because substantial evidence supports the ALJ's pain standard analysis and the ALJ's RFC finding that Mr. Murdock could perform a limited range of light work with the ability to alternate sitting and standing every 30 minutes throughout the workday, the Court must affirm the ALJ's decision.[16]

-------

[16] Under 20 C.F.R. §§ 404.1567(b) and 416.967, light work is work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Light work includes sedentary work.  S.S.R. 83-10 explains that a job qualifies as light work "when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs.  A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work."  S.S.R. 83-10 also states:  "Relatively few unskilled light jobs are performed in a seated position."  In addition:

> "Frequent" means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time.  The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping.  Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.  They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

S.S.R. 83-10.  The 30-minute sit/stand option "without leaving workstation" in Mr. Murdock's RFC restricts him from the full range of light work and gears his work towards positions that require less walking and provide a seated option such as cashier or mail sorter.

## CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision.

**DONE** and **ORDERED** this March 20, 2025.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE